The **MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado corporation, et al., Plaintiffs and Respondents,**

v.

**SALT LAKE COUNTY, a body corporate and politic, et al., Defendants and Appellants.**

No. 20522.

Supreme Court of Utah.

June 24, 1985.

114

Ted Cannon, Salt Lake County Atty., Gavin J. Anderson, Deputy County Atty., Salt Lake City, for defendants and appellants.

Scott M. Matheson, Alan Sullivan, Sam Gaufin, Kent Winterholler, Floyd A. Jensen, Salt Lake City, for plaintiffs and respondents.

DURHAM, Justice:

The defendant Salt Lake County (the County) appeals from a summary judgment and permanent injunction declaring a portion of a county ordinance levying a utility tax null and void and permanently enjoining the County from enforcing the tax. We affirm.

On December 14, 1984, the Salt Lake County Board of County Commissioners

enacted the Salt Lake County Utility License Tax Ordinance, which became effective January 1, 1985. That ordinance (1) grants a 50-year franchise for the use of public rights-of-way by utility service providers in the unincorporated areas of the County; (2) establishes certain regulations regarding the use and repair of the rights-of-way; and (3) imposes and provides for enforcement of a gross revenue tax of six percent of receipts from the sale of utility services in the unincorporated areas of Salt Lake County. (The term "utility services" is defined in the ordinance as the providing of natural gas, electrical energy, or basic telephone exchange services.) The funds derived under the ordinance are to be used as general operating revenues to provide municipal services to the unincorporated areas.

The plaintiffs Mountain States Telephone and Telegraph Co. (Mountain Bell) and Mountain Fuel Supply Co. (Mountain Fuel) are public utilities providing utility services to the unincorporated areas. They use public rights-of-way for telephone lines and natural gas lines. Neither utility has a current franchise with the County to use these rights-of-way.

Effective January 1, 1985, Mountain Bell and Mountain Fuel received authority from the Public Service Commission to include the amount of the utility license tax in the utility bills of their customers in the unincorporated areas. In addition to Mountain Bell and Mountain Fuel, the utility plaintiffs, there are six corporate plaintiffs and five individual plaintiffs. The corporate plaintiffs and the individual plaintiffs are customers of the utilities or represent the utilities' customers, and these customers would be liable for the utility tax as passed through to their utility bills. Several of the plaintiffs filed suit as individuals, seeking a declaration that the tax is unlawful and seeking an injunction against collection of the tax. The cases were consolidated, and other plaintiffs were joined as parties.

On February 16, 1985, the parties' cross-motions for summary judgment came before the district court. The court concluded:

(1) that defendant Salt Lake County lacks the lawful authority to levy and collect the Utility License Tax at issue in this case; (2) that neither section 17–5–27 nor section 17–5–39, Utah Code Ann., (1973 Repl.Vol.), nor any other provision of Utah law entitles Salt Lake County to levy or collect the said tax; and (3) that defendant Salt Lake County may not lawfully levy or collect the said tax without explicit authority from the Utah legislature.

Accordingly, the district court entered summary judgment for the plaintiffs, declaring the tax to be "unlawful, invalid, void and of no effect," and enjoined the County from levying, collecting, or enforcing the tax. All remaining and unresolved issues were dismissed by court order and by stipulation of the parties. Further, by stipulation, the parties agreed that tax collection would be postponed during the pendency of the appeal and that the effective date of the ordinance would be amended to July 1, 1985.

The County raises three issues on appeal. First, may a county levy a utility business license tax for both regulation and revenue? Second, may a county levy such a tax absent express power from the Legislature—i.e., by a county's "implied, necessary, and inherent powers"? Finally, may a county levy a utility tax for general revenue purposes as a condition to granting a franchise for the use of public rights-of-way?

Our recent decision in *Consolidation Coal v. Emery County*, Utah, 702 P.2d 121 (1985), is dispositive of the first and second issues. In *Consolidation Coal*, we rejected the argument that Emery County had inherent power to impose a revenue tax in connection with a business license ordinance. We said, "Whether a given licensing ordinance is an exercise of the municipality's police power or its taxing power, the state must have expressly authorized the exercise. 'In other words, a municipal corporation has no inherent licensing power.'" *Consolida-*

*tion Coal,* at 123 (quoting 9 E. McQuillin, *The Law of Municipal Corporations* § 26.22, at 41 (3d ed. rev. 1978)). We followed this Court's holding in *Cache County v. Jensen,* 21 Utah 207, 61 P. 303 (1900): "[A] right to license a business or occupation does not imply a right to exact a tax merely for revenue, and, where the object is revenue, the power to license for that purpose must be conferred in unequivocal terms." *Id.* at 218, 61 P. at 305 (quoted in *Consolidation Coal,* at 124). Salt Lake County has no inherent power to impose a revenue tax by means of its Utility License Tax Ordinance.

*Consolidation Coal* is also dispositive of the County's argument that the Legislature granted the County express authority to impose a business license tax to raise revenue equivalent to the power possessed by cities. The County asserts that U.C.A., 1953, § 17–5–27 (1973) expressly grants the County the power to tax for revenue. That section authorizes the commissioners to

> license *for purposes of regulation and revenue* all and every kind of business not prohibited by law ... carried on in the county outside the limits of incorporated cities; they may [also] fix the rates of license tax upon the same....

*Id.* (emphasis added).

The meaning of that language was directly addressed in *Consolidation Coal,* wherein we affirmed the holding of *Cache County* that the Legislature did not grant equivalent licensing tax powers to counties and cities. "[S]ection 17–5–27 does not permit the counties to raise revenue through licensing, except insofar as such revenue is necessary to (and therefore proportionate to the cost of) regulation of the licensed entities." *Consolidation Coal,* at 127.

█ The Legislature has substantially revised the licensing enabling statute since *Cache County* was decided over 85 years ago. Despite these revisions, the Legislature has never seen fit to disapprove, expressly or by implication, that case's construction of the phrase "license for purpose of regulation and revenue." Furthermore, on a number of occasions during this lengthy time period, the Legislature has granted specific taxing powers to the counties in response to specific needs. Neither this legislative approach nor any of that legislation supports the view that the County now urges us to adopt. On the contrary, the only logical inference is that the Legislature has been and continues to be satisfied with the holding in *Cache County* that express grants of authority are necessary before counties can impose a general revenue tax and that the respective statutes dealing with cities and counties confer different powers. *Compare Cache County v. Jensen,* 21 Utah 207, 61 P. 303 (1900), with *Ogden City v. Crossman,* 17 Utah 66, 53 P. 985 (1898) (construing a city's power to impose a general revenue tax under a licensing ordinance).

█ We note here, because of the County's argument respecting the powers of cities to tax for revenue, that there are inherent differences between cities and counties which justify, at least historically, a different legislative approach to taxing powers. Counties are subdivisions of the state and act only as arms of the state. *See, e.g., Lund v. Salt Lake County,* 58 Utah 546, 559, 200 P. 510, 515 (1921). County governments are imposed upon state citizens who do not have the choice to reject that form of government. In contrast, the residents of a city can choose *not* to be bound by a city government. *See, e.g.,* 1 E. McQuillin, *supra,* § 2.46(a) at 190 ("counties are created without the consent of the inhabitants, whereas the existence of municipal corporations ordinarily depends on the consent of the inhabitants"). Consequently, it is arguable that the citizens of a county are entitled to expect that the taxing authority of a county government, imposed upon them by the state, will be limited by the state. That, in any event, was the result of the *Cache County* decision, and it is a result which has never been disavowed or abandoned by the Legislature, whose intent controls the meaning of the statutes in question.

The only issue in this case that is not fully resolved by our decision in *Consolidation Coal* is the County's assertion that it may levy a utility tax as a condition to the granting of a franchise for the use of public rights-of-way. The County argues that the imposition of a six percent gross revenue franchise tax is a reasonable and common condition to the granting of such a franchise and that this tax is well within the broad franchising discretion statutorily granted to counties, which is commonly used throughout the state by cities to impose utility taxes.

█ The County relies upon U.C.A., 1953, § 17–5–39 (1973) for authority to impose a gross revenue tax on utilities. This section provides in relevant part:

> [Counties] may grant franchises along and over the public roads and highways for all lawful purposes, upon such terms, conditions and restrictions as in the judgment of the board may be necessary and proper, to be exercised in such manner as to present the least possible obstruction and inconvenience to the traveling public. . . .

There is no express language in this section that confers any kind of taxing authority. The remaining question, therefore, is whether the power to grant franchises for use of public roads necessarily *implies* a power to tax a potential franchisee and, if so, to what extent. The County argues that the phrase "upon such terms, conditions and restrictions as in the judgment of the board may be necessary and proper" implies a power to impose a revenue tax. This argument finds no support in the cases the County cites on the point. No decisions of this Court contain even the suggestion that the County's power to place conditions on a franchise carries with it the power to tax all potential franchisees in amounts wholly unrelated to the actual value of the franchise or the cost of regulating the franchised use of the public roads. The words "upon such terms, conditions and restrictions" in section 17–5–39 can, in our view, relate only to the regulation of use of the public roads. This inter-pretation is further supported by the language that a county's regulation is "to be in such manner as to permit the least possible obstruction and inconvenience to the traveling public." It is irrational and contrary to the Legislature's approach to county taxing powers to read a general taxing power into such language. Elsewhere, the Legislature has specifically delineated and limited the taxing authority of counties. *E.g.,* U.C.A., 1953, §§ 59–9–6.2 to –6.3 (1974 & Supp.1983) (property tax); §§ 11–9–1 to –11 (1973 & Supp.1983) (sale and use taxes). Such delineation and limits would be superfluous and without meaning if, with a general statutory reference to "terms, conditions and restrictions," the Legislature were determined to have given counties a new and general source of power to tax for revenue purposes.

█ The County also contends that it has greater discretion than cities to impose conditions on franchisees and concludes that it should therefore have greater authority to tax. The County relies on U.C.A., 1953, § 10–8–14 (Supp.1983) and *Mountain States Telephone and Telegraph Co. v. Ogden City,* 26 Utah 2d 190, 487 P.2d 849 (1971), for this contention. The County ignores, however, the fact that the cities' authority to exact revenue is not derived from section 10–8–14, which authorizes the construction of city gas works and telephone systems, but rather from section 10–8–80, which explicitly authorizes the cities to raise revenue by taxing licensees. This same fact distinguishes another case upon which the County relies, *Salt Lake City Lines v. Salt Lake City,* 6 Utah 2d 428, 315 P.2d 859 (1957), in which the city looked to section 10–8–80 for its authority to tax a franchised bus company. Because the utilities have entered into franchise agreements with cities or cities impose license taxes on utilities cannot be a basis for inferring power in the County to impose franchises or franchise taxes. This Court recently said:

> Title 17 of the Utah Code deals exclusively with counties: creation, officers,

powers and so on. Chapter 8, Title 10 deals exclusively with the powers and duties of all cities.... Thus it can be seen that there is a legislative scheme to deal with each political subdivision and its powers and duties separately.

*Utah County v. Orem City*, Utah, 699 P.2d 707, 709, (1985). Thus, the statutory authority of cities is clearly different from that of counties.

■ Counties may, of course, reasonably regulate the use of public roads and may charge reasonable fees to defray the cost of regulation. But the County's power to regulate its rights-of-way does not imply a general taxing power, and local revenue measures are ultra vires where they are supported by nothing more than the power to regulate. Courts in other jurisdictions have reached similar conclusions. In *City of Chicago Heights v. Public Service Co.*, 408 Ill. 604, 97 N.E.2d 807 (1951), the court struck down an ordinance which imposed license fees greatly in excess of the reasonable cost of regulating the use of city streets. *See also*, 12 E. McQuillin, *supra*, § 34.82 at 200 ("the fee is invalid if its amount is so much in excess of that necessary for supervision and inspection that it is clear the fee is one for revenue"). In *Chesapeake & Potomac Telephone Co. v. City of Morgantown*, 143 W.Va. 800, 105 S.E.2d 260 (1958), the city sought to impose both a "license tax" and a "use fee" on the utility, following expiration of a 40-year franchise, where the parties were unable to agree on a new franchise. As in the present case, the ordinance also contained provisions regulating the use of public streets. The court upheld the "license tax," which was essentially a schedule of modest charges for various types of excavation in the public streets, on the reasoning that the charges were reasonable and their use was specifically limited to defray the cost of supervision, inspection, and approval of the work. However, the court struck down the "use fee," which was a schedule of charges based on the type and amount of the telephone company's property in the public streets, on the ground that it was purely for revenue pur-

poses, and the legislature had not expressly delegated authority to impose such a tax.

■ In the present case, the County has admitted that revenues from the utility license tax bear no relation to and will greatly exceed anticipated costs of regulation. Hence the tax is invalid because there is no express or implied authority to impose it.

Accordingly, we affirm the district court's summary judgment and injunction.

HALL, C.J., and HOWE, J., concur.

ZIMMERMAN, Justice (concurring in the result):

I concur in the result reached by the majority. However, I write separately to state that with respect to the County's power to levy a utility business license tax for revenue purposes under section 17–5–27 of the Code, my sole ground for affirmance is that *Cache County v. Jensen*, 21 Utah 207, 215–22, 61 P. 303, 305–07 (1900), disposed of this question and that in the intervening 85 years the legislature has apparently acted on the premise that *Cache County*'s construction of the predecessor to section 17–5–27 was correct. I must agree with Justice Stewart that there is little basis for the majority's indulging in the usual presumption that the legislature, in reenacting section 17–5–27 years after *Cache County* issued, must have intended to embrace the holding of that case. As Justice Stewart demonstrates, the *Cache County* analysis has been eroded by later cases.

I am compelled to concur with the result reached by the majority, however, because there is other ample reason to conclude that the legislature has specifically adopted the *Cache County* analysis of county taxing powers. After *Cache County*, the legislature enacted several statutes granting counties authority to impose taxes for revenue purposes under limited circumstances. *See, e.g.*, U.C.A., 1953, §§ 11–9–1 to –11 (Supp.1983) (granting counties authority to impose sales and use taxes); U.C.A., 1953,

§§ 17–31–1 to –3 (Supp.1983) (granting counties authority to impose transient room tax). Had the legislature believed that *Cache County* was wrong and that counties had the broader revenue powers claimed by Salt Lake County in this case, those statutes would have been entirely unnecessary. Accordingly, the principles contained in *Cache County* have clearly been woven into the fabric of our law. Under these circumstances, the time for us to depart from *Cache County* is long past. Salt Lake County must look to the legislature for the power to impose the broader and more equitably based taxes that cities can now impose and which it argues urban counties need to function in the modern environment.

By concurring in the result reached today, I do not endorse the suggestion in the majority opinion that any substantial justification now exists for the distinction this Court drew in *Cache County* and *Ogden City v. Crossman*, 17 Utah 66, 53 P. 985 (1898), between the taxing powers of counties and cities. I find that distinction untenable in light of the quite similar language used in the relevant statutes. *Compare* U.C.A., 1953, § 17–5–27 (1973 ed.) *with* U.C.A., 1953, §§ 10–8–39, –80 (1973 ed.). I also agree with Justice Stewart that there is no longer any justification for giving a niggardly interpretation to the powers of local governments. That approach is outdated and can only impede the solution of local problems by local governments.

STEWART, Justice (dissenting):

I dissent because, in my view, the Legislature has clearly conferred upon counties the power to impose a franchise tax for revenue purposes. Utah Code Ann., 1953, section 17–5–27, provides that a county "may license for purpose of regulation and revenue all and every kind of business not prohibited by law...." Similar language in the Utah Code dealing with the powers of cities and towns has been uniformly construed to permit cities and towns to impose a license or franchise tax for reve-

nue purposes only. *E.g., Mountain States Telephone and Telegraph Co. v. Ogden City*, 26 Utah 2d 190, 487 P.2d 849 (1971); *Davis v. Ogden City*, 117 Utah 315, 215 P.2d 616, 16 A.L.R.2d 1208 (1950); *Ogden City v. Crossman*, 17 Utah 66, 53 P. 985 (1898).

The basic justification for the Court's invalidation of the tax in question is the Court's reliance upon *Cache County v. Jensen*, 21 Utah 207, 61 P. 303 (1900), which invalidated an occupation tax on the ground, among others, that the predecessor of section 17–5–27 did not delegate power to counties to impose such taxes. In *Cache County*, this Court held that the term "and revenue" in the statute conferred on counties the power to tax only in an amount sufficient to cover the costs incurred by the issuance of a license to a business. However, the language of the statute on its face does not impose such a limitation.

Since *Cache County*, this Court has recognized the unsoundness of that ruling with respect to the taxing power of counties and has tacitly overruled that part of the case. A number of cases have cited *Cache County* since 1900, and only once, in 1908, did this Court cite *Cache County* for the limitation imposed upon a county's taxing powers. *See Salt Lake City v. Christensen Co.*, 34 Utah 38, 95 P. 523, 527 (1908). By 1930, that proposition appears only in dissents. *See, e.g., Best Food v. Christensen*, 75 Utah 392, 285 P. 1001, 1005 (1930) (Straup, J., dissenting).

In 1950, this Court in *Davis v. Ogden City*, 117 Utah 315, 215 P.2d 616, 16 A.L.R.2d 1208 (1950), finally interred, until today, whatever lingering effect *Cache County* had. In *Davis*, the plaintiff argued that under the *Cache County* rationale a city licensing and revenue ordinance was invalid. In response to that argument, Justice Latimer observed that "it is doubtful whether the language relied on [in *Cache County*] by the plaintiff is not dictum for the reason that the important principle announced in that case was that the

tax was arbitrary and discriminatory."[1] 117 Utah at 326, 215 P.2d at 621. The majority opinion does not even cite *Davis v. Ogden City.*

In my view, it is no answer to argue that the *Cache County* ruling was in effect adopted by the Legislature when it reenacted that section (with changes in other parts of the statute) some years later. This Court in *Davis v. Ogden City* apparently did not think that was the case. More recently, we again considered the authority of counties to enact occupation taxes under the same statutory authority in *State v. Taylor,* Utah, 541 P.2d 1124 (1975). Although the issue was not raised for decision, the Court stated that the ordinance was a revenue measure and referred to section 17–5–27 as the source of the county's power to enact an occupation tax.

It is true that the Court in *State v. Taylor* did not refer to *Cache County v. Jensen,* but neither did it refer to the rejection of *Cache County* in *Davis v. Ogden City.* In any event, the Court, on the plain language of the statute, concluded that the Legislature had conferred the power to levy an occupation tax. Sound reasons support that view. The Legislature's intent was manifest and clear when it first enacted the statute in question. There is no evidence whatsoever that when it reenacted this provision along with other provisions dealing with counties, that it ever focused on, or was even aware of, this Court's decision in *Cache County.* It is not without significance that our Legislature has little staff assistance, and no doubt had much less help, if any, when the reenactment of the statute in question was accomplished. The most logical assumption to be made is that when the Legislature revised the statute in question, it did not adopt the *Cache County* opinion nor take it into account at all. It is a strange notion that if this Court errs in construing a statute, then only the Legislature and not

this Court can correct the error, especially when no vested rights are involved.

Furthermore, in my view it is past time for the law dealing with the powers of cities and counties to be freed from the outworn and paralyzing legal dogmas of the past century. Traditionally, the powers conferred on local governmental units have been construed with extraordinary strictness. But, as explained in *State v. Hutchinson,* Utah, 624 P.2d 1116 (1980), the rule that courts must strictly construe the powers conferred on cities and counties is no longer appropriate. In *State v. Hutchinson,* we unshackled the police power of local governments from the unrealistic restrictions imposed by the nineteenth century doctrine called Dillon's Rule. In the instant case, the spirit of *Hutchinson* ought to be followed, in my view, to remove any doubt as to a taxing power which the Legislature has granted to counties. The fact that cities have long exercised this power is evidence enough that the Legislature is satisfied with the exercise of that power by local governments and that counties ought not to be treated differently. In *Hutchinson,* we stated in language fully applicable here:

> [I]t is not appropriate for this Court to enfeeble local governments on the unjustified assumption that strict construction of delegated powers is necessary to prevent abuse.
>
> . . . .
>
> In short, we simply do not accept the proposition that local governments are not to be trusted with the full scope of legislatively granted powers to meet the needs of their local constituents.

*Id.* at 1121. *See also Salt Lake City v. Ronnenburg,* Utah, 674 P.2d 128 (1983). *Accord Tipco Corp. v. City of Billings,* Mont., 642 P.2d 1074 (1982); 3 C. Sands & M. Libonati, *Local Government Law* section 13.05 (1982); 3 Sutherland, *Statutes and Statutory Construction* section 64.02 (C. Sands rev. 4th ed. 1974). *See generally*

---

1. In *Davis, Cache County v. Jensen* is referred to as *Matthews v. Jensen.* 117 Utah at 325, 215 P.2d at 621.

2 E. McQuillin, *The Law of Municipal Corporations* sections 10.18a–10.21, & vol. 6, sections 24.43–24.45 (3d ed. 1979).

Of course, the Legislature must exercise paramount control over the actions of municipalities except where the constitution dictates otherwise. Clearly, cities and counties cannot intrude on or subvert legislative policies, nor may they act in areas requiring a uniform state approach, whether the Legislature has specifically established a policy or not. *State v. Hutchinson.* However, in truth, state and local governance has become so complicated that the Legislature must, of necessity, rely upon local governmental units to attend to many areas that the Legislature might, in days gone by, have attended to. The Salt Lake County budget is now at a level where it would have exceeded the budget for the entire State of Utah not too many years ago. County governments and city governments deal with momentous decisions that affect the lives of the citizens who are subject to their jurisdiction perhaps more directly than any other level of government, at least in several critical areas. While there can be no doubt that the Legislature has paramount authority over the powers exercised by city and county governments, the relationship ought to be seen as essentially a cooperative relationship rather than an adversarial relationship.

The practical effects of today's decision are significant. The only alternative that Salt Lake County has to raise additional funds in lieu of the franchise tax at issue, is to increase property taxes in the unincorporated areas for providing essentially municipal-type services. This Court is well aware of the difficulties and hardships, even extreme hardships, that have arisen as a result of escalating property taxes and of the impact which they have had on the average citizen. *See generally Rio Algom Corp. v. San Juan County,* Utah, 681 P.2d 184 (1984). The inequities of that system of taxation that have become apparent in the past few years will be significantly exacerbated by the Court's refusal to leave *Cache County* interred in the grave be-nignly dug for it by this Court in *Davis v. Ogden City.*

Finally, every case I have found from other jurisdictions that has dealt with this issue under similar statutory grounds has ruled contrary to the result reached by the majority. *See City of Phoenix v. Arizona Sash, Door & Glass Co.,* 80 Ariz. 100, 293 P.2d 438 (1956); *Ex parte Mirande,* 73 Cal. 365, 14 P. 888 (1887); *City of Bellevue v. Patterson,* 16 Wash.App. 386, 556 P.2d 944 (1976), *overruled on other grounds, King County v. Algona City,* 101 Wash.2d 789, 681 P.2d 1281 (1984). In view of these authorities, the rejection of *Cache County* by *Davis v. Ogden City,* and what I think the plain language of section 17–5–27 requires, I dissent.